# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| **IN RE:** | **BANKRUPTCY PROCEEDING** |
| **YEHIA OSMAN** | |
| **A/K/A JAY OSMAN** | **CASE NO. 17-52099 KMS** |

| | |
|---|---|
| **COMMUNITY BANK** | **PLAINTIFF** |
| **VS.** | **ADVERSARY PROCEEDING NO. _____** |
| **YEHIA OSMAN** | |
| **A/K/A JAY OSMAN** | **DEFENDANT** |

## COMPLAINT OBJECTING TO DISCHARGE

COMES NOW, Community Bank ("Community"), by and through its attorney, and files this Complaint Objecting to Discharge against Yehia Osman a/k/a Jay Osman, and in support thereof, would show unto the Court the following:

<u>Jurisdiction</u>

1.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334, 28 U.S.C. §157, 11 U.S.C. §1141, 11 U.S.C. §727 and related code sections and rules.

2.

This matter is a core proceeding.

<u>Parties</u>

3.

The Plaintiff is Community Bank, a banking institution doing business in the Southern District of Mississippi. Community Bank (hereinafter "Community") is represented by Derek A.

Henderson, Attorney at Law, 1765-A Lelia Drive, Suite 103, Jackson, Mississippi 39216.

4.

The Defendant is Yehia Osman a/k/a Jay Osman, an individual residing in the Southern District of Mississippi and may receive service of process at 2519 Pomenade Boulevard, Ocean Springs, Mississippi 39564. Yehia Osman a/k/a Jay Osman ("Debtor" or "Osman") is represented by Jarrett Little, Lentz & Little, PA, 2505 14th Street, Suite 100, Gulfport, Mississippi 39501.

Statement of Facts

5.

On October 25, 2017, Yehia Osman a/k/a Jay Osman filed his petition under Chapter 11 of the United States Bankruptcy Code before the United States Bankruptcy Court for the Southern District of Mississippi. The Debtor has continued as Debtor-in-Possession.

6.

At the time of the filing of the petition, Osman was indebted to Community.

7.

On October 25, 2017, the Debtor filed his bankruptcy schedules which included the following:

Docket No. 7   Chapter 11 Statement of Monthly Income provides that the average monthly income from all sources during the six (6) full months prior to bankruptcy filing was $4,250.00 per month from operating a business.

Docket No. 9   Schedule A/B: Property

    Part 4, No. 17 -   Checking / Community Bank - $2,500.00

                                          Checking / Community Bank - $500.00

    Part 4, No. 19 -   Osman Holding Company, Inc. (51%) - $76,328.00

Docket No. 9   Schedule E/F: Creditors Who Have Unsecured Claims

        Part 4, No. 4.4 -        Community Bank - $1,450,000.00

        Part 4, No. 4.5 -        Community Bank - $5,241.00

<u>Docket No. 9</u>  Schedule Income

        No. 8 -        Debtor's net income from business - $4,250.00

<u>Docket No. 9</u>  Statement of Financial Affairs

        No. 4 -        Gross Income / 2017 - $38,250.00

        Gross Income / 2016 - $104,467.00

        Gross Income / 2015 - $94,052.00

The schedules and statement of financial affairs are filed under penalty of perjury.

8.

On November 3, 2017, the Debtor filed his Disclosure Statement ("DS") (Docket No. 17) and Plan of Reorganization ("Plan") (Docket No. 18). The Debtor's DS asserts that the Debtor is well educated with extensive financial experience serving as Executive Vice President, Senior Vice President and Chief Financial Officer of companies (DS, Article III, Sec. A, Page 2). Further based upon Osman's "financial expertise", Osman has individually maintained the books and records of Osman Holding Company, Inc. ("OHC") (DS, Art. III, Sec. A, Page 3).

9.

The Debtor reports his interest in OHC at $76,328.00 (DS, Art. III, Sec. C, Page 4).

10.

The Debtor asserts that his income from OHC is $4,250.00 per month and that his net disposable income is $888.00 pe month (DS, Art. V, Page 14).

11.

The Debtor asserts that his interest in OHC is valued at $76,528.00 (DS, Art. VI, Page 14).

12.

The Debtor further asserts in his Plan that his Net Disposable Income to fund the Plan is $900.00 per month (Plan, Art. XII, Paragraph 12.1, Page 8).

13.

On December 4, 2017, the Debtor filed amended bankruptcy schedules which included the following:

<u>Docket No. 49</u>     Statement of Financial Affairs

                                No. 4 -     Gross Income / 2017 - $20,306.00

                                No. 9 -     Added lawsuits

The amendments are filed under penalty of perjury.

14.

On December 13, 2017, the Debtor appeared at the §341 meeting of creditors where he provided sworn testimony which included the following:

14.1

    Q    Sir, are you personally familiar with the information contained in the petition, schedules, statements and other related documents filed in your bankruptcy case?
    A    Yes.
    Q    Did you furnish the information to your attorney's office that was used to prepare the petition, schedules, statements and other related documents?
    A    Yes.
    Q    Sir, did you sign the petition, schedules, statements and other related documents filed in your bankruptcy case?
    A    Yes.
    Q    And did you read those documents before you signed them?
    A    I have.
    Q    To the best of your knowledge, sir, is the information contained in the petition, schedules, statements and other related documents true and correct?
    A    Yes.

(341 Transcript, Page 4, Line 13 to Page 5, Line 9)

14.2

Q      Do you, sir, personally conduct any other kind of business activity or interest other than your work for Osman Holding Company?

A      No, this is it. Occasionally I do some consulting, financial consulting.

(341 Transcript, Page 10, Line 9 to Line 13)

14.3

Q      Okay. If you turn over to the next pages, the income that's listed here on Schedule I, is it still correct?

A      Yes.

(341 Transcript, Page 32, Line 14 to Line 17)

14.4

Q      Did you voluntarily sign your schedules in your bankruptcy case, Mr. Osman?

A      Yes.

(341 Transcript, Page 32, Line 23 to Line 25)

14.5

Q      Mr. Osman, did you voluntarily sign your amended Statement of Financial Affairs filed in your case?

A      Yes.

(341 Transcript, Page 36, Line 24 to Page 37, Line 2)

14.6

Q      Okay. So if the company pays the 52,000 a year, how is that getting addressed to Andrea Osman?

A      Well, it's simply the company generates $120,000 a year in cash flow. She's entitled to 49 percent of that, which very closely approximates the amount of money that she's getting from the debt service on that.

Q      Okay. So you're telling me that this - - this $52,000 a year, if that's the number, payments and taxes roughly.

A      Right.

Q      That goes as a distribution to her?

A      Well, you can consider it that.

Q      Well, I'm asking you how it's shown on your books. That's what I'm trying to figure out.

A       Okay. How it's shown on the books, it's you have a note payable. When we pay the debt, it goes - - it reduces the note. When - - when the books at the end of the year are reduced to taxes and the debt reduction is not listed in the - - because the note is not on the - - on the tax return, okay, so it goes against equity to the equity holder. So on the tax return, it would show as payment to shareholder or note holder.

(341 Transcript, Page 47, Line 22 to Page 48, Line 20)

14.7

Q       And in your Schedule B where you've got listed Osman Holding Company, you've got a value down at your interest at $76,328.
A       Yes.
Q       Okay. How did you determine that value?
A       Okay. Every industry has a multiple, and some business call it factor or cap rate. Like real estate for instance, they call it cap rate. Anyway, every industry has a multiple. The ATM industry a fairly young industry and there has not been a lot of transactions and activity, but in researching, we found a company that does that, and they had publications and I subscribed to it. I think Bill has pulled up right now. And basically, the multiple I used was very generous. Typically, it's one time annual cash flow because of the risk inherited.

(341 Transcript, Page 53, Line 17 to Page 54, Line 8)

14.8

A       There was no transfers from me personally or the business in the last three or four years to get money out of the business.

(341 Transcript, Page 60, Line 14 to Line 16)

15.

On January 5, 2018, the Debtor filed a second Amended Statement of Financial Affairs which included the following:

| Docket No. 63 | Statement of Financial Affairs | |
|---|---|---|
| | No. 4 - | Gross Income / 2017 - $38,250.00 |
| | No. 9 - | Lawsuits were removed |
| | No. 27 - | Added P&J of Ocean Springs, LLC |

The amendments are filed under penalty of perjury.

16.

On January 5, 2018, the Debtor filed an amended Schedule E/F (Docket No. 65) which removed from prior schedules (Docket No. 9) -

No. 4.1     Bank of America removed - $196,491.00

No. 4.3     Charter Bank removed - $177,444.00

No. 4.6     Ditech Financial removed - $240,847.00

The amendments are filed under penalty of perjury.

17.

On January 10, 2018, Community filed the following proofs of claim:

Claim No. 5 - $1,407,754.11

Claim No. 6 - $5,308.39

18.

On January 12, 2018, filed a Periodic Report Regarding Value, Operations and Profitability of Entities in which the Estate Holds a Substantial or Controlling Interest (Docket No. 73). Attached as Exhibit A to the Report (Docket No. 73-1) the Debtor asserts that the 2016 OHC income is $44,054.00 and the EBITDA is $166,252.00.

19.

Further, during the bankruptcy proceeding the Debtor produced tax returns to the Office of the United States Trustee and to Community providing proof of income.

20.

Also, during the bankruptcy proceeding, pursuant to Rule 2004 Orders, the Debtor, OHC and the Debtor's spouse produced financial records for review. Although final review has not been completed, Community issued a letter to the Debtor on February 1, 2018, which included the

following;

A preliminary investigation has determined the following to be true:

We have reviewed the following selected items as it relates to Osman Holding Company and Yehia and Andrea Osman, Osman Holding Company, Inc.'s 2016 Form 1120S U.S. Income Tax Return for an S Corporation, 2016 Form 1040 U.S. Individual Income Tax Return for Yehia and Andrea Osman; General Ledger for Osman Holding Company, Inc. for the years ended December 31, 2015 and 2016 and for the ten months ended October 31, 2017; a Balance Sheet and Profit and Loss Statement for the same periods as the general ledgers; copies of selected checks from Osman Holding Company, Inc.'s bank accounts during 2010 and 2011 (related to the Bayou Sauvolle property); and selected bank statements for accounts held by Osman Holding Company, Inc. for 2015, 2016 and for January though October, 2017. We will continue to investigate OHC's ATM account transactions. Listed below are some preliminary observations:

1. The property located at Bayou Sauvolle appears to have had improvements and note payments totaling more than $232,797.91. We did not have general ledgers for the years 2012, 2013, or 2014 to review. This is a low number. Other payments were made.

2. A reconciliation of the 2016 company tax return to the financial statements and the general ledger for the year ended December 31, 2016 was attempted. While we were able to trace some of the expenses listed on the Profit & Loss statement to the tax return, there were many others that we could not. For example, charges against retained earnings (distributions) for the year was $12,000.00 per the general ledger. However, the tax return showed $40,778.00 in distributions, a difference of $28,770.00. There were expenses listed on the Profit & Loss statement that were $1,000.00, $4,000.00 or $5,000.00 more when they were shown on the tax return. There was an expense on the tax return for Rents ($106,206.00), but no expense listed as rent on the Profit & Loss statement. The financial statements show Rental Income for six properties, but there is not a separate reporting on the tax returns, as required by federal and state statute. On the federal tax return, Schedule M-2, Analysis of Accumulated Adjustments Account has a duplicate entry for depreciation. The tax return purports to use the cash basis, but there are several accruals included under expenses. Legal fees alone have $72,000.00 in accruals that were not paid by the end of 2016. The BP oil settlement was not reported correctly. There were not any wages reported for the officers or shareholders. Payments to an individual for delivery of cash to ATM machines was included with bank charges instead of non-employee compensation. There are other questionable transactions. But, this only includes the year 2016.

3. On the tax return and the Profit & Loss statement, there are many

personal expenses of the shareholders that are charged as company expenses, reducing the taxable income for the shareholders. Examples of these are as follows: Medical and dental expenses of the shareholders; Cash taken by the shareholders and their family; Health insurance reimbursement to shareholders; Life insurance, home insurance and vehicle insurance for all the shareholders' vehicles, not just company vehicles; Shareholders' personal federal and state income taxes; cash reimbursement of utilities. It was projected what 2017's total would be using the ten months we had and added 2015's and 2016's totals to arrive at an annual average of over $68,000.00 in personal expenses that were claimed as business expenses.

There is obviously other transactions to be reviewed and considered. There are all types of credit card charges to OHC, many electronic fund transfers (eft) to Andrea Osman and lists of payments on Andrea's behalf including but not limited to $50,000 in March 2016 to set money aside for children education fund. Also, there are numerous checks for cash in large amounts ($50,000, $60,000 and $80,000) that are not explained. And, for your information there is a journal entry on October 25, 2017 for Chapter 11 Retainer, Lentz & Little $12,000.00 which was charged to legal fees.

A clear example of the misuse of OHC and failure to follow corporate formalities is shown by review of the purchase of Lot 27 Bayou Sauvolle, Ocean Springs, Jackson County, MS ("Lot 27"). On or about December 18, 2009, John Drake ("Drake") executed a Deed to Andrea J. Osman. The deed was recorded December 23, 2009. Andrea J. Osman executed a Deed of Trust to John Drake which was also recorded on December 23, 2009. A Promissory Note was executed by **OHC** in the amount of $245,000.00. The payments were for 180 months (January 18, 2010 to December 18, 2024) in the monthly amount of $2,067.45. All payments were made by **OHC**. A modification was done to the Note and starting January 18, 2013, the payment increased to $3,901.75 per month. The Modification was recorded on January 2, 2013 and payments were changed (January 18, 2013 to December 18, 2017). **OHC** made all payments and real estate tax payments. Also, many improvements were made to Lot 27 during this time period totaling at least $116,163.74. The last and final payment was December 2017. Now that Lot 27 has been paid for and improved, it is listed for sale with an asking price of **$449,711.00**. Even though all funds were paid by OHC and the John Drake payments and the payments for improvements were listed as liabilities and expenses of OHC, Lot 27 rests in the name of Andrea Osman.

On February 11, 2018, the Debtor's attorney confirmed in writing that "Mr. Osman exclusively controls OHC."

21.

Based upon Osman's "exclusive" control of OHC and his financial background and expertise,

Osman knew that the figures, financial information and statement of value from OHC were not correct and were misstated. Osman had complete knowledge of the funds that were being taken from OHC but were not being reported to the IRS and the Bankruptcy Court as income. Osman knew the representations made regarding the income of OHC and the EBITA were not true and accurate. Osman also participated in having funds removed from OHC to purchase assets and OHC had assets that if liquidated would result in additional value to OHC. In short, OHC has been used as the Debtor's personal bank account and with full and complete knowledge of the use of the OHC accounts, the Debtor made misrepresentations as to his income, salaries from officers, contributions, and the value of OHC all in an effort to pay less to Community.

## COUNT ONE - OBJECTION TO DISCHARGE

22.

Community incorporates and re-alleges herein by reference Paragraphs 1 through 21 above.

23.

The Debtor has knowingly and fraudulently made a false oath or account in or in connection with his bankruptcy case.

24.

The Debtor's discharge should be denied pursuant to 11 U.S.C. §1141(d)(3) and 11 U.S.C. §727(a)(4).

25.

Community objects to the Debtor being granted a discharge.

## COUNT TWO - OBJECTION TO DISCHARGE

26.

Community incorporates and re-alleges herein by reference Paragraphs 1 through 25 above.

27.

The Debtor has with the intent to hinder, delay or defraud Community and/or the bankruptcy estate by transferred, removed and/or concealed or permitted to be transferred, removed and/or concealed property of the Debtor within one year of the date of filing of the bankruptcy petition or property of the estate after the bankruptcy petition.

28.

The Debtor's discharge should be denied pursuant to 11 U.S.C. §1141(d)(3) and 11 U.S.C. §727(a)(2).

29.

Community objects to the Debtor being granted a discharge.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff, Community Bank requests that the Court to find that its Complaint Objecting to Discharge is well taken and should be granted. Community Bank requests the Court to enter judgment in favor of Community Bank and against the Defendant, Yehia Osman a/k/a Jay Osman denying his discharge.

Respectfully submitted,

By: s / Derek A. Henderson
DEREK A. HENDERSON
ATTORNEY FOR COMMUNITY BANK

**Derek A. Henderson, MSB #2260**
**1765-A Lelia Drive, Suite 103**
**Jackson, MS 39216**
**(601) 948-3167**
**derek@derekhendersonlaw.com**